## *In re* MEAD, Bankrupt.

*(District Court, S. D. New York.* November 21, 1882.)

1. BANKRUPTCY—EXPUNGEMENT OF DISPROVED CLAIM.

Where, upon a long re-examination of a creditor's proof of debt, the claim, as made, is disproved in form and substance, it should be expunged.

2. SAME—JOINT TRANSACTIONS—FILING NEW PROOFS.

Where a large claim was proved upon six notes, alleged to have been given for loans of money and ·accumulated interest thereon, and on re-examination it appeared that none of the notes were given on a loan at interest, but that all the advances of money were made for the purposes of continuous speculation in city lots through many years upon joint account between the creditor and the bankrupt, and under his management; that large losses had eventually arisen, apparently sufficient to cover all the creditor's claims, and that no final account as to the result of all the joint transactions had ever been had: *held,* that the notes were not intended as unconditional promises of payment, but were subject to the final result of the joint transactions, and that the proof of them as absolute debts on loans at interest should be expunged, with liberty to the creditor to file new proof on the result of the joint transactions, if anything should be claimed to be due thereon, on payment of costs, and on filing a statement in detail of the account on which the claim should be made.

*Nelson Smith* and *C. A. Hart,* for contestants.

*Edward G. Black,* for claimant.

BROWN, D. J. The contesting creditor in this proceeding seeks to expunge a proof of debt made by the claimant James C. Mead, a cousin of the bankrupt, upon five promissory notes of the latter, dated in 1873, 1874, and 1875, to the amount of $34,350. The adjudication of bankruptcy was made on June 29, 1878, in involuntary proceedings, upon the petition of six creditors, including the claimant, at the instance and request of the bankrupt or his attorneys. The regular business of the bankrupt was that of a plumber, but he had been largely engaged in speculation in city lots during 15 or 20 years prior to the adjudication; and in the year 1875, or prior thereto, he had become insolvent through the great depreciation in the value of

real estate during the few years previous. The claimant, in his original proof of debt, states that the notes were given for money "loaned and advanced by him to the bankrupt at or about the dates of the several notes," etc. By an additional affidavit which has been 'admitted as an amended statement of the consideration of the notes, they are alleged to have been given "for moneys loaned and advanced by the claimant to the bankrupt at or about the dates of said notes and of other notes surrendered, and the notes now proven or given, and interest on sums which had been loaned prior to the giving and receipt of said notes."

Though the grammatical construction of the amended statement may be dubious, the meaning is plain that the sole foundation of the claim is a simple loan of moneys to the bankrupt at various times, with the accumulations of interest thereon; and the notes are presented as unconditional obligations of the bankrupt to pay the amounts stated in them, as they import upon their face.

The examination of this claim, under section 5081 of the Revised Statutes, upon which a large mass of evidence has been taken, discloses transactions between the claimant and the bankrupt running back, perhaps, to 1860. But no books of account recording any of these transactions are produced, nor any vouchers in support of a single one of the alleged original loans. The claimant, moreover, was unable on his examination to specify the date or amount of any one of all his alleged advances of money; but he estimated that the total amount advanced by him to the bankrupt was from $10,000 to $12,000, the rest of the claim being profits.

These advances are repeatedly spoken of in the testimony as loans upon interest. But the examination shows by a great preponderance of testimony, both of the claimant and of the bankrupt, that all the moneys advanced by the claimant were advanced for the purposes of continuous 'speculations in city lots, on the joint account of the claimant and the bankrupt, and of others who might advance him money for the same purposes; the purchases and sales to be made by or under the management of the bankrupt, and the profits to be divided, *pro rata*, according to the money of each employed in the purchases. Up to about 1872 these speculations seem to have been largely profitable. Many such purchases and sales on joint account were made and large profits thereon were reported by the bankrupt to the claimant. No accounting in detail was ever had between the parties as to any of the purchases and sales. The claimant took, without question, such statements of the results as the bankrupt from time to

time made to him. On January 1, 1875, the claimant's interest in the joint operations had amounted, according to an entry made by the bankrupt in his pocket diary of that date, "in an accounting with James C. Mead," to "$18,970 in cash due him, not invested, and $21,380 invested into lots."

The claimant testified explicitly that none of the moneys advanced, or of the profits thereon from time to time, were ever withdrawn by him; but that, as often as any lots were sold, both the principal invested in them and his share of the profits were left in the hands of the bankrupt for further similar speculative purchases, and that the bankrupt had full authority from him to employ all such moneys and profits in that way, and that this understanding between them continued *down to the last.*

From some portions of the testimony it would appear that notes were sometimes given on the original advance of the money; from other portions that notes would be taken when profits were ascertained or declared upon some sale of lots, the former notes being surrendered and new ones substituted, including the profits. But from the explicit testimony of the claimant that it was the understanding that all such advances and profits remained in the bankrupt's hands for further speculation on joint account down to the last, and from the fact that they were so used or held by the bankrupt, it is manifest that such notes could not have been either given or received, or intended by either party, as unconditional obligations to pay the sums named in them. They were necessarily subject to the result of the speculations in which the parties were jointly engaged, and they were probably designed as no more than memorandums or vouchers of the estimated amount in round numbers (for they do not accord in dates or in amounts with any of the entries in the bankrupt's private dairy) of the contributions of the claimant, from time to time, to the joint operations in charge of the bankrupt. Upon notes given for such a purpose, or on such an understanding, the facts being proved or admitted, no judgment could be recovered while the joint transactions remained open and unsettled, as in this case.

The basis of the claim, as stated both in the original and in the amended proof of debt, is therefore shown to be erroneous. The notes do not represent any loan of money upon interest; nor was there ever any unconditional obligation of the bankrupt to pay the amount of the notes, as they import on their face, or any part of

v.14,no.5—19

them. A loan on interest, with a further stipulation for a share of any profits which the bankrupt might make by the use of the moneys on his own account, would have been usurious. But it is very clear, upon all the evidence, that these were not such loans at all. The moneys advanced remained in the bankrupt's hands, the proper moneys of the claimant, for use in speculation on joint account; the claimant's share of the profits, when collected, were the claimant's proper funds; and both were subject to deduction for his share of any losses that might arise, and at the close of all the transactions on joint account, any moneys in the bankrupt's hands and any claim against him for previous receipt of such moneys, were subject to be offset by whatever losses in any of the joint transactions were justly apportionable to the claimant's share.

At the date of the "accounting" above referred to, viz., January 1, 1875, 11 lots, purchased about 1872, in which $21,380 of the claimant's funds are said to have been invested, were still unsold. They had greatly depreciated in value since the purchase, and large loss upon them beyond the money invested in the purchase, was then obvious. They were shortly afterwards, during the year 1875, disposed of, either at private sale or by foreclosure, and at such a loss upon the claimant's share therein as would appear, from the evidence put in by the contestant, to exceed the amount of the notes proved and the entire credit given to the claimant by the bankrupt in his entry of January 1, 1875.

The claimant's share of the loss in these lots would be an offset even against any claim upon the bankrupt on loans independent of the joint transactions; and this offset, as I have said, seems, from the evidence, to be equal to the entire claim presented, unless the claimant's share in the 11 lots referred to was subsequently materially diminished. It is contended by the claimant that it was so diminished in January and February, 1875, to the extent of $13,000, upon an agreement to that effect made in January and February, 1875, at the time when the notes of $6,000 and $8,000 were given, and that these two notes were given as absolute obligations. But I am not satisfied from the evidence that any such change in the relative obligations of the parties, or any such reduction in the claimant's share of the losses justly chargeable against him, is made out, either in law or upon the facts.

. As above stated, in January and February, 1875, when the agreement for the partial withdrawal of the claimant's interest in the lots is alleged to have been made, large losses beyond the money invested

in the lots then held on joint account had obviously been incurred. The claimant had then no interest in them, of any pecuniary value, which he could convey or transfer to the bankrupt, but only a large loss which he was legally bound to share with him *pro rata*. Accordingly, no transfer or sale of his interest to the bankrupt is spoken of in the testimony; but only a withdrawal of so much from the lots. But, in fact, the claimant then had no moneys in those lots which could be withdrawn; all that had been invested in them on his account had been plainly lost, and far more; and I cannot doubt that both parties knew this fact. Upon the testimony, the note of $8,000 appears to be nothing but a voluntary concession to the claimant's complaints, without any legal demand upon the bankrupt for any valuable interest in the lots. Any new agreement, however, whereby the bankrupt's share of the losses already incurred was to be materially increased, could only be sustained upon some sufficient legal consideration.

The only consideration alleged is in connection with the note of February, 1875, and the alleged "withdrawal" of $5,000 at that time, viz., in the advance of $1,000, by the claimant to the bankrupt, to enable him to rescind a contract of sale of his house on Fifty-third street, and to pay back the cash received on the contract of sale; and the bankrupt testifies that the giving of the note of February, 1875, and the "withdrawal," were "on the same day" as the advance of the $1,000, "or on the next day." But the testimony subsequently taken shows incontestably that this repayment was in September, 1874, some four or five months before the time of the alleged partial withdrawal of the claimant's interest in the lots, and before the giving of either of the two notes referred to; so that if the partial "withdrawal" of the claimant's interest was in January and February, 1875, as alleged, it was without any proved legal consideration; nor can it be supposed that the bankrupt would be willing to assume a greatly-increased share of the loss without any consideration whatever. But if he were willing, a mere promise to do so, and a note given for no other consideration, would not be legally binding.

On the other hand, if the time of the "withdrawal" be supposed to have been erroneously stated as in January and February, 1875, instead of September, 1874, then the evidence fails to connect the notes of January and February, 1875, with any such withdrawal four or five months previous; and the bankrupt's entry on January 1, 1875, of the result of "the accounting with James C. Mead" on that date, must be held to include and to allow for any such "withdrawal"

or change of interest made in the September previous; and the claimant's share of the losses would then remain undiminished, as shown by the contestant.

Moreover, the testimony in relation to the alleged "withdrawal" refers only to an interest in the particular lots then unsold, and does not show any change whatever in the conditions or purposes for which the money deemed withdrawn from the lots was still left in charge of the bankrupt. The claimant says expressly that the same arrangement continued down to the last; so that the notes of January and February, 1875, if given on the withdrawal, as claimed, would not differ in character from the previous ones, but would be legally subject to the result of the final accounting as to all the joint transactions.

Holding upon the evidence, therefore, that none of the notes in question were given upon any loan of money on interest, or intended as absolute or unconditional promises to pay the amounts mentioned in them, but that they were at most merely vouchers for the estimated amount of the claimant's moneys in charge of the bankrupt for the purposes of speculation in lots on joint account, and therefore at all times subject to the final result of all the joint transactions; that this original understanding of the parties continued unchanged "down to the last;" and that large losses ultimately arose in the joint transactions, a part of which is chargeable against the claimant, and no final account in relation thereto having ever been had between the bankrupt and the claimant,—I must hold that the proof of debt as filed is not made out, either in form or in substance, and that it must therefore be expunged. Whether anything is owing to the claimant, either upon the notes, or for his advances and profits, depends wholly upon the result of the final purchases and sales on joint account; and this has never been ascertained, either by any attempted settlement between the parties, or by any accounting in court. The evidence given in this proceeding by the contestant in relation thereto was incidental only, and not upon a direct issue on that subject.

Although the evidence, therefore, shows losses sufficient to cover all the claimant's demands, it should not, I think, be held to preclude further examination on that subject, if on a just accounting as to all the joint transactions, anything is claimed to be due.

An order should, therefore, be entered expunging the proof of debt as made, but without prejudice to the claimant, or his representative, filing new proof of debt for any balance claimed upon joint

transactions in real estate, or upon an account stated as the result of all their joint dealings; but such new proof should not be allowed except upon payment by the claimant of the costs already incurred in this proceeding, nor except upon a statement in detail of the account of the joint transactions since the last actual settlement between the parties, upon which any balance may be claimed; and in any proceedings for the re-examination of such new proof of debt, if made, the testimony already taken, or any part thereof, may be used by either party.